Judgment rendered August 9, 2023.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 55,255-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

JEREMY WALKER                               Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 383,677

Honorable Christopher T. Victory, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Peggy J. Sullivan

JAMES E. STEWART, SR.                Counsel for Appellee
District Attorney

TOMMY J. JOHNSON
KODIE K. SMITH
BRITTANY B. ARVIE
Assistant District Attorneys

* * * * *

Before HUNTER, MARCOTTE, and ELLENDER, JJ.

MARCOTTE, J.

This appeal arises from the First Judicial District Court, Parish of Caddo, the Honorable Chris Victory presiding. Defendant, Jeremy Walker, was convicted of two counts of first-degree rape and sentenced to life imprisonment at hard labor without benefits for each count, to be served consecutively. For the following reasons, we affirm Walker's convictions and sentences and remand with instructions.

Walker was initially charged by bill of information with two counts of molestation of a juvenile under the age of 13. However, on September 30, 2021, Walker was charged by bill of indictment with two counts of first-degree rape, in violation of La. R.S. 14:42(A)(4). Count one stated that Walker had oral sexual intercourse and anal sexual intercourse with M.W. (DOB: 12/24/07), without consent and when the victim was under the age of 13.[1] Count two stated that Walker had oral sexual intercourse and anal sexual intercourse with R.D. (DOB: 2/11/11), without consent and when the victim was under the age of 13. Both offenses occurred on or about December 24, 2014.

Following the empaneling of a 12-member jury, a trial was held on July 26-27, 2022. M.W., who was 14 years old at the time of trial, testified that he knew Walker as his babysitter's friend; he identified Walker in court. M.W. stated that he gave an interview at the Gingerbread House Children's Advocacy Center ("Gingerbread House") on May 21, 2021, when he was 13 years old. The audio and video recording of that interview was admitted and played for the jury.

---

[1] Victims' initials and their family members' first names are provided throughout this memorandum to protect victims' identities in accordance with La. R.S. 46:1844(W).

In the Gingerbread interview, M.W. spoke about something that happened at his babysitter's house when he was seven years old. His babysitter was named Latoya.[2] M.W. said that Latoya had a friend named Jeremy who had sex with him. M.W. recalled a time that he was at Latoya's house and Jeremy was playing hide-and-go-seek with him and the other kids. Jeremy separated him from the other children, took him to a room, pulled M.W.'s pants down and "sucked me off." M.W. said he urinated in Jeremy's mouth.

M.W. described another incident that happened on the couch at Latoya's house where Jeremy made him "stick it inside of him," and forced M.W. to kiss him and perform oral sex on him. M.W. recalled that Jeremy would make him sit on his penis, and Jeremy would put his penis into M.W.'s butt, which "would kinda sting." M.W. said those incidents would take place in the living room. When Jeremy finished, he would wipe M.W.'s butt, because his butt was wet. M.W. also stated that he saw Jeremy do these same things to Latoya's son, R.D. M.W. said R.D. was younger than him.

M.W. described Jeremy as light-skinned, real tall, wears glasses, tattoos on his arms, pink lips, and was "kinda big," at the time.

M.W. testified that he told the truth in his Gingerbread House interview. On cross-examination, M.W. affirmed that Walker would call Latoya's house and ask her if he was present. M.W. confirmed that when Walker performed oral sexual intercourse on him, he urinated in Walker's mouth and Walker spit it out. M.W. stated that what Walker spit out was

---

[2] Latoya is the mother of victim, R.D.

"the color of pee." M.W. said that when Walker made him stick his penis inside Walker's butt, Walker was lying on his stomach and he was on top of Walker, with Walker's hand on his butt pushing him down. M.W. stated that Walker had been "chubby," but he knew Walker had been "working out," because his mother showed him a picture of Walker and asked him, "This the man?"

F.J., who is M.W.'s stepsister, and was 13 years old at the time of trial, testified that she knew Walker as her babysitter's friend. She identified Walker in court. F.J. was interviewed at the Gingerbread House, and the audio and video recording of the interview was played for the jury. In her Gingerbread interview, when asked if she knew why she was there, F.J. responded that she was there to talk about the man that did something to M.W. F.J. explained that she and M.W. are close, and he told her what happened to him when they went to Latoya's house. F.J. said that sometimes "the man" would come over and M.W. would act differently when the man would be there. F.J. said that M.W. acted "scared." She also said that everyone would be in Latoya's daughter's room, except for M.W. and the man.

F.J. affirmed that she told the truth in her Gingerbread House interview. F.J. stated that she was six years old when she was at Latoya's house and she was not afraid of Walker, but she noticed that M.W. was afraid of Walker when he came over. She did not discuss that with M.W. when she was little, but she did talk to him about it once he revealed his experiences to his family. F.J. said that she only recalled one other adult coming to M.W.'s house, but it was "not that often" that that person came to the house.

3

Christina, M.W.'s mother, testified that Latoya babysat M.W. and F.J. when they were six to seven years old. Christina stated that Latoya's son, R.D., is autistic and at the time Latoya was babysitting her kids, R.D. was nonverbal. Latoya babysat M.W. and F.J. before and after school, and all day in the summer. Christina knew Walker as Latoya's best friend; she identified him in court. She saw Walker at Latoya's house a couple of times, but not regularly. She stated that she exchanged few words with Walker and did not really know him.

Christina stated that, on the Monday after Easter 2021, her sister called her about M.W. M.W. told his aunt what Walker did to him. She said that her sister was a therapist and her son felt comfortable speaking with her. After M.W. told his mother what had happened to him, Christina took him to the Shreveport Police Department ("SPD") and reported that her son had been molested by Walker.

Christina said that when she spoke with M.W. about what happened, he told her that he was six or seven years old at the time the abuse occurred and everything happened at Latoya's house. Christina said that M.W. told her that it was Latoya's friend who had abused him. Christina recalled two male friends being present at times at Latoya's house, so, using her phone, she showed M.W. a picture from Latoya's Facebook page taken during one of the birthday parties. The picture depicted Walker, and she asked M.W. if he was the person who abused him, and he said, "Yes."

Christina testified that an SPD detective arranged a Gingerbread House interview and following the interview, M.W. attended therapy. Christina said that since attending therapy, M.W. "seems fine," but there are times when he gets "pretty isolated."

4

Christina spoke with Latoya every few months after she stopped babysitting her kids, and she attended children's birthday parties at Latoya's house afterwards. Walker was present at those parties. She stated that if she had learned of any abuse, she would have reported it immediately. Christina said that she was unaware of any sexual abuse experienced by R.D.

On cross-examination, Christina said that she gave SPD Walker's full name and reported him as the person who abused her son. She got his name from Facebook, because the Facebook photo she showed to M.W. was tagged with his name. Christina testified that she also showed M.W. a Facebook picture of the other man she remembered being at Latoya's house and that he stated that was not the person who molested him.

Corporal Roland Garner ("Cpl. Garner") testified that he was working SPD patrol on April 5, 2021, when he responded to a report of a sexual assault at the police station. He met with Christina who informed him that her son had been molested when he was six or seven years old. Christina told Cpl. Garner that when M.W. was with his family he had an emotional breakdown and let his mother know that he had been molested while at his babysitter's house. Christina informed Cpl. Garner that while M.W. was there, he was forced to perform oral sex on a male and the offender would do the same to him. He passed the information on to Detective Sherrie Stump ("Det. Stump"), of the SPD Sex Crimes Unit, who investigated the matter.

On cross-examination, Cpl. Garner stated that he mostly spoke with Christina about what happened to M.W., but M.W. was present while he took the report and he was "all emotional." Cpl. Garner stated that Christina told him that the offender was "Jeremy Walker" and he wrote his name into

his report. Cpl. Garner affirmed that Christina said she thought the offender was a friend of the babysitter's, but she was not sure.

Lacie Hadley ("Hadley"), a forensic interviewer at the Gingerbread House, testified that she conducted forensic interviews with M.W. on May 21, 2021, F.J. on May 26, 2021, and R.D. on May 28, 2021. She followed the legal guidelines when conducting all three interviews. Hadley stated that during her interview with R.D., he did not make any disclosures. During all three interviews, Hadley took notes which were admitted into evidence. Hadley said that M.W. disclosed to her during his interview that there was a man named Jeremy who performed sexual acts on him. Hadley testified that F.J. informed her that something happened to her brother, M.W., and "she would go over there and would play with the children there."

Hadley discussed delayed disclosure, which is where there is a gap in time between when the abuse occurred and when the child discloses the abuse. Hadley testified that delayed disclosure is a factor in this case, and that young children may not comprehend the abuse that is happening to them, which makes telling another person about the abuse challenging and scary for them.

On cross-examination, Hadley said that due to R.D.'s developmental capacities, he did not mention any abuse that he suffered. She said that she reviewed the interviews she conducted with M.W. and F.J., but not her interview of R.D., because he did not disclose anything. When asked if she treated an affirmative denial of abuse as if the child did not disclose anything, she answered negatively.

R.D. testified that he was 11 years old at the time of the trial. He stated that he knew Jeremy and he identified him in court. When asked if he

told his mom that Jeremy did anything bad to him, R.D. said, "Actually he just wiped me." R.D. said that Jeremy wiped him on his mouth and when asked what he was doing that required Jeremy to wipe his mouth, R.D. responded, "I don't even know." When asked if anyone did anything bad to him, R.D. said, "No." When asked if Jeremy did anything bad to him, R.D. responded, "No."

Latoya testified that R.D. has high-functioning autism and that he learns at a slower level. She said that when he was younger, R.D. was nonverbal, but he started talking at five or six years of age after he started taking speech classes. R.D. is uncomfortable speaking to or in front of people he doesn't know.

Latoya stated that Walker was her best friend and she had known him for 17-18 years. She identified Walker in court. In 2014-2015, Latoya ran her own in-home daycare on Marquette Street, Shreveport, Louisiana, where she supervised about six children between the age of newborn infants to 12 or 13 years old. She was friends with Walker at that time, and he would come to her home while she was running that business, if she needed help. She recalled that M.W. and F.J. were two of the children she watched; they would be dropped off around 6:00-7:00 a.m. and be picked up around 5:00 p.m. Latoya said that she trusted Walker around the children, including R.D., and she would leave them alone with him when she was not present at her house.

Latoya testified that she spoke with an SPD detective in May 2021, who informed her that she needed to bring R.D. to the Gingerbread House for an interview, which she did the next day. Latoya told the forensic interviewer that R.D. has autism and that he barely speaks to anyone he does

not know and that he might not answer any questions. Following the interview, the detective told Latoya that R.D. did not make any disclosures. When asked if she spoke with her son again after he was interviewed, Latoya testified that he told her what had happened to him. Defense counsel objected to any further statements about Latoya's conversations with her son as hearsay. A bench conference was held, but the trial court did not make a ruling on the objection.

Latoya said that when she spoke with R.D., "He told me that Jeremy forced him to put his penis in his mouth and touched him some." She said that R.D. "didn't say much," but he began disclosing more once he started going to counseling. Latoya said that he "[j]ust broke down crying and just stayed in my arms for a while," and that is a type of emotion that R.D. does not usually show. Latoya reported what R.D. said to Det. Stump.

On cross-examination, Latoya testified that Christina encountered Walker a few times while he was in her home. The last time Latoya spoke with Walker was in June 2021. Latoya could not recall whether Walker had ever called her home while she was babysitting to ask if a particular child was there, but if he had she would have thought that strange. Walker would come to her home one or two times a week when she needed help. Latoya did not speak with Christina about what happened.

Latoya said that the only time that R.D. said that nothing happened was at the Gingerbread House, because he did not want to tell them anything. She did not recall any of the children she supervised being afraid of Walker.

Det. Stump testified that she was the lead detective in Walker's case; she identified Walker in court. Det. Stump supervised Hadley's interview of

8

M.W. at the Gingerbread House where he stated that Walker sexually assaulted him when he was seven years old. Det. Stump said that M.W. stated in his interview that Walker performed oral sex on him, made M.W. "stick it inside of him, made me kiss him and suck him off." M.W. also remembered that Walker would make him sit on his penis, which would sting. M.W. stated that afterward, his butt would be wet, and Walker would then "wipe his butt off." M.W. said that he also saw Walker do the same things to R.D.

After M.W.'s interview, she spoke with Christina who provided her with Latoya's name and phone number. Det. Stump also supervised F.J.'s interview at the Gingerbread House. F.J. stated that she and M.W. were close and he told her what happened to him when they were at Latoya's house. F.J. also said that M.W.'s demeanor would change when Walker was around, and he would act scared.

Det. Stump supervised R.D.'s interview at the Gingerbread House. Det. Stump said that R.D. is autistic and did not disclose any incidents of sexual assault, but she had a follow-up interview with Latoya after R.D.'s Gingerbread House interview. Defense counsel then objected to Det. Stump testifying about what Latoya told her R.D. said. The court did not rule on the objection. Det. Stump said that Latoya informed her that R.D. disclosed to his mother that Walker had put his penis in his mouth and butt and told him not to tell anyone. Latoya said that R.D. asked his mother to forgive him and said that he was sorry for not telling her.

On cross-examination, Det. Stump testified that after she supervised M.W.'s Gingerbread House interview, she contacted Latoya and told her that one of the children in her care may have been a victim of sexual abuse. She

9

also informed Latoya that R.D. might have been a victim as well. Det. Stump said that Latoya was shocked to learn that Walker was identified as a suspect in the sexual assault of M.W. and R.D., because she had been best friends with him for years. Latoya never expressed to Det. Stump that she was suspicious of Walker.

Out of the presence of the jury, defense counsel clarified his argument regarding his objection to both Latoya's and Det. Stump's testimony. Defense counsel argued that Latoya's statement regarding R.D.'s disclosure of abuse to her and Det. Stump's recounting of what Latoya told her that her son said constituted impermissible hearsay testimony. Defense counsel claimed that the state was attempting to impeach its own witness. Defense counsel stated that Det. Stump recounting what Latoya told her R.D. said did not describe anything that happened in the investigation after the Gingerbread House interview, except to make the conclusion that sexual assault occurred. The state contended that Det. Stump's testimony about what Latoya told her about R.D.'s statement to his mother explained why the detective then charged Walker with an additional count of first-degree rape.

The trial court said that it was clear that Det. Stump's testimony was not being offered to prove the truth of the matter asserted, but rather she was able to testify based on her personal knowledge of what the mother of the victim told her, which led to Walker's indictment, arrest, and trial. The trial court stated that R.D. testified that Walker did not do anything to him, and he was available for cross-examination and provided an inconsistent statement. The trial court noted that this is a special case where there is a juvenile and sex allegation. The state rested.

10

Walker was advised of his Fifth Amendment right to remain silent; he elected to testify in his own defense. Walker stated that he did not sexually assault M.W. or R.D. He testified that other adult "guy friends" were present at Latoya's daycare and that she "had a lot of traffic" at her house at the time.

On cross-examination, Walker stated that he had known Latoya since 2004 and he considered her his best friend at the time the offenses were committed. He affirmed that he was at her house one or two times a week after school to help her with her daycare and that M.W., R.D., and F.J. were at times present while he was at Latoya's house. He stated that there were times that Latoya would leave him alone at her house with those kids to pick up other kids from school. Walker stated that he had a good relationship with Latoya at the time that she came forward with charges of him sexually abusing her son. Walker also said that he never had any negative interactions with Christina when he saw her in passing at Latoya's house.

Walker said that when he was left in charge of the children at Latoya's house all of the children would be in one room, "[be]cause I can't watch kids running around the house and stuff like that." He stated that he would be using the computer in the same room while the kids were in the living room playing. Walker testified that he did play with R.D. every once in a while, because he was Latoya's son. He said that when he was alone with the kids, he would watch them and make sure they didn't break anything.

On redirect, Walker stated that he never "played" with the kids, but he was in charge of them and he had them in the same room together. The defense rested.

The state called Latoya as a rebuttal witness. She said that when she ran her daycare business, she did not allow guests to come over, because she had other people's children in her home. She said that she did not have a lot of traffic through her house during business hours.

Following deliberation, the jury found Walker guilty as charged on both counts. The jury was polled, and the verdict was unanimous.

On August 8, 2022, a sentencing hearing was held. Walker filed a post-verdict judgment of acquittal and a motion for a new trial. Both motions were denied and the defense waived any delay in sentencing. The trial court advised Walker of his appeal and post-conviction relief time delays. The trial court considered La. C. Cr. P. art. 894.1 in sentencing Walker and found that there was a risk that he would commit another crime, he needed custodial treatment, and a lesser sentence would deprecate the seriousness of his crimes.

The trial court also listed several aggravating factors found in La. C. Cr. P. art. 894.1. The trial court found that Walker having no prior criminal history was a mitigating factor.

The trial court sentenced Walker to life imprisonment at hard labor without benefits on each count, to run consecutively. The trial court informed Walker that if he should get out of prison, he would be required to register as a sex offender for life. However, no written notice of the sex offender registration requirement appears in the record. Walker now appeals.

## DISCUSSION

*Sufficiency of the Evidence*

12

Walker's first assignment of error is that the evidence is insufficient to support either of his convictions. He argues that Latoya testified that none of the children at the daycare seemed afraid of him, including F.J., who did not disclose that M.W. seemed afraid of him until after he reported that he had been assaulted. Walker argues that M.W.'s description of abuse, specifically that Walker would have M.W. lie of top of him and push M.W.'s butt down from that position "seems an unlikely manner in which this would happen with others present to whom M.W. could have gone to get out of that situation."

Walker states that no one else saw him take M.W. off by himself despite others being present in the home, and M.W. did not complain about the abuse until six or more years later. Walker argues that M.W.'s statement that Walker would call Latoya's house to see if he was there was not corroborated by her. Walker also complains that Christina conducted her own investigation by showing M.W. a picture of him, which he argues is the equivalent of a police photo lineup influencing a witness' testimony.

Walker contends that R.D. denied being a victim of sexual assault and the only thing Walker did was wipe his mouth, which is not evidence of sexual assault. Walker says the only evidence that R.D. was a victim of sexual assault was his mother's hearsay testimony and M.W.'s statement.

The state contends that M.W. described Walker performing oral sex on him and sticking his penis in his butt, which caused a stinging sensation, proving the elements of oral and anal sexual intercourse as required by La. R.S. 14:42. M.W. testified that he was seven years old at the time of the offense, meeting the burden of proving the victim was under the age of 13. F.J. reported that Walker would separate M.W. from the other children and

13

that M.W. acted differently when Walker was around. M.W. described in his Gingerbread interview seeing Walker make R.D. perform oral sex on him and wiping his mouth off. Walker had control over M.W. and R.D. when Latoya was absent.

The state argues that the members of the jury saw that R.D. did not disclose that he was abused, but they were informed that R.D. is autistic, is uncomfortable speaking with people he does not know, and his mother explained that he might not answer questions he does not understand.

In assessing the sufficiency of the evidence, a reviewing court must consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Leger*, 17-2084 (La. 6/26/19), 284 So. 3d 609; *State v. McFarlin*, 54,754 (La. App. 2 Cir. 1/25/23), 354 So. 3d 888. The *Jackson* standard does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. La. C. Cr. P. art. 821; *State v. Pigford*, 05-0477 (La. 2/22/06), 922 So. 2d 517.

The appellate court does not assess the credibility of witnesses or reweigh evidence, and accords great deference to the trier of fact's decision to accept or reject witness testimony in whole or in part. *State v. McFarlin, supra*. Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the issue is the weight of the evidence, not its sufficiency. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is

14

sufficient support for a requisite factual conclusion. *Id.*; *State v. Gullette*, 43,032 (La. App. 2 Cir. 2/13/08), 975 So. 2d 753. This principle is equally applicable to victims of sexual assault; such testimony alone is sufficient even when the state offers no medical, scientific or physical evidence to prove the commission of the offense by the defendant. *State v. McFarlin, supra*; *State ex rel. P.R.R., Jr.*, 45,405 (La. App. 2 Cir. 5/19/10), 36 So. 3d 1138.

La. R.S. 14:42(A)(4) provides:

A. First degree rape is a rape ...where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
...

(4) When the victim is under the age of thirteen years. Lack of knowledge of the victim's age shall not be a defense.[3]

Viewing the evidence in the light most favorable to the prosecution, the state presented sufficient evidence at trial for a reasonable jury to convict the defendant of first-degree rape of a victim under the age of 13. The state established that both victims were under the age of 13 when the sexual assaults occurred. M.W., in his Gingerbread interview, gave his age when he was assaulted, and his mother testified to his age when he went to Latoya's house for daycare. M.W. stated that R.D. was younger than him when he went to Latoya's house for daycare. Latoya testified that that she operated a daycare from her home in 2014-2015, which corresponds with R.D. being approximately four years old at the time.

---

[3] At the time of the offenses, La. R.S. 14:42 titled the offense "aggravated rape," which was subsequently retitled "first degree rape." The pertinent language from the statute remains the same.

The state also established that Walker performed oral and/or anal intercourse upon the victims without their consent. M.W., R.D., F.J., Christina, and Latoya all identified Walker in court. In his Gingerbread interview, M.W. described the sexual acts that Walker performed on him or made him perform on Walker, which included anal and oral intercourse. He also described Walker engaging in similar behavior with R.D. The behavior witnesses described meets with the statutory definition of "rape" found in La. R.S. 14:41. Walker had control over M.W. and R.D. when Latoya was absent. F.J. testified that Walker would separate M.W. from the other children and her stepbrother acted differently when Walker was around.

Latoya testified that R.D. disclosed Walker's abuse stating that "Jeremy forced him to put his penis in his mouth and touched him some." The jury clearly accepted the testimony of the state's witnesses as more credible than Walker's. It was within the discretion of the trier of fact to make such a credibility determination, and this court will not disturb this determination on appeal. This assignment of error lacks merit.

*Hearsay Testimony*

In Walker's second assignment of error, he claims that impermissible hearsay testimony was offered at trial by Latoya and Det. Stump. Walker states that since R.D. denied any sexual assault occurred during his testimony, the hearsay was offered to prove the truth of the matter asserted. Walker argues that extrinsic evidence is admissible to attack the credibility of a witness including inconsistent statements contradicting the testimony of a witness, but only when offered to attack the credibility of that witness and only if the probative value is outweighed by the unfair prejudice of the

16

evidence. Walker contends that a prior inconsistent statement may not be offered to prove the truth of the matter asserted.

Walker says that here, the hearsay evidence presented was not consistent with R.D.'s testimony, but rather Latoya's testimony was the opposite of that of her son. Walker acknowledges that testimony regarding initial reports or complaints concerning sexual assault is an exception to the hearsay rule, but Det. Stump's testimony was not a statement made by R.D. and was not the initial complaint. Walker argues that La. C.E. art. 801 requires that that the victim must testify consistently with the initial complaint and be available for cross-examination for the statement to be admitted. Walker contends that the hearsay offered here did not fit within the permitted exceptions and its probative value was greatly outweighed by its prejudicial effect. Walker also argues that the evidence was not properly introduced as impeachment evidence. Walker maintains that the error in allowing the hearsay testimony rendered his trial unfair. Walker asks this court to vacate his convictions and order a new trial.

The state argues that the testimony of a law enforcement officer taking particular action in response to information received from an out-of-court declarant during her investigation will not be considered hearsay, because it is not offered to prove the truth of the matter asserted, but rather to explain the events leading to the defendant's arrest. The trial court ruled at trial that Det. Stump's statements were not offered to prove the truth of the matter asserted and the court noted that the statements were inconsistent with R.D.'s testimony. The state notes that defense counsel did not request a limiting instruction at the introduction of the statements.

17

The state argues that the jurisprudence has relaxed evidentiary standards applied in cases involving sex crimes against children. The state contends that R.D. is autistic, was very young at the time the crimes occurred, and was reluctant to open up to strangers. The state maintains that Latoya's reporting of R.D.'s statement to Det. Stump provided a basis for her to proceed with the investigation, but also placed at issue his mental and emotional condition at the time he made the statement. The state says that the hearsay exception found in La. C.E. art. 803 is based upon the idea that the spontaneous expression of the declarant's mental and emotional condition at the time the statement is made is generally a reliable indication of his state of mind. The state contends that R.D.'s state of mind was at issue to explain the declaration to his mother in light of the Gingerbread non-disclosure and his testimony in court.

The state contends that R.D. was available for cross-examination and defense counsel did not question him on his declarations. The state also argues that the statements attributed to R.D. by his mother and Det. Stump corroborated the eyewitness testimony of M.W. and their testimony was cumulative. The state asks this court to affirm Walker's convictions and sentences.

Hearsay is not admissible except as otherwise provided by the Louisiana Code of Evidence or other legislation. La. C.E. art. 802. "Hearsay" is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801(C). La. C.E. art. 804(B)(5), provides:

18

B. Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

….

(5) Complaint of sexually assaultive behavior. A statement made by a person under the age of twelve years and the statement is one of initial or otherwise trustworthy complaint of sexually assaultive behavior.

We note that R.D. was under 12 years of age when he made his statement to his mother regarding Walker's sexual abuse. Yet, R.D. was available as a witness at trial, so at first glance, La. C.E. art. 804(B)(5) does not appear to apply to his mother's testimony regarding his disclosure of abuse. However, the Louisiana Supreme Court stated in *Folse v. Folse*, 98-1976 (La. 6/29/99), 738 So. 2d 1040, 1047:

> It is well known and documented that sexual abuse of children is extremely difficult to detect because "the offense often takes place in secret, the victim is young, vulnerable, and reluctant to testify, and there is often no physical or other evidence the abuse took place." *State v. Miller,* 98–0301 (La. 9/9/98), 718 So. 2d 960, 962. The evidence is rarely direct, but is circumstantial. ... Thus, the purposes of unearthing the truth under the difficult circumstances of child sexual abuse would be served by permitting a judge to use the rules of evidence as guides rather than blinders because the relaxed standard is responsive to the circumstances in which child abuse occurs and is exposed.

Furthermore, even if hearsay evidence is erroneously admitted at trial, confrontation errors are subject to a harmless error analysis. *State v. Dillard*, 45,633 (La. App. 2 Cir. 11/3/10), 55 So. 3d 56, *writ denied*, 10-2853 (La. 11/18/11), 75 So. 3d 454. An error is harmless when the guilty verdict was surely unattributable to the error. *State v. Robertson,* 06-1537 (La. 1/16/08), 988 So. 2d 166. Factors to be considered include the importance of the evidence to the state's case, whether the testimony was cumulative, the presence or absence of additional corroboration of the evidence, the extent

19

of cross-examination permitted, and the overall strength of the state's case. *State v. Dillard, supra.*

This case presents a unique factual scenario because R.D. was an available witness and his mother testified about his out-of-court statement. But, R.D. was four years old and nonverbal at the time the crime was committed, he has autism, and he struggles to communicate with strangers. This court finds that a relaxed evidentiary standard is applicable here given the exceptional circumstances. Additionally, Walker was allowed to cross-examine R.D., and Latoya's testimony was corroborated by M.W. who stated in his Gingerbread House interview that he witnessed Walker abusing R.D., making her testimony cumulative.

Regarding Det. Stump's statement about what Latoya told him about R.D. disclosing abuse, the statement was not offered to prove the truth of the matter asserted and does not amount to hearsay. The state claimed, and we agree, that Det. Stump's statement was offered to explain why, during the course of her investigation, she arrested Walker and he was charged with the first-degree rape of R.D. Any oversight in allowing hearsay testimony from Latoya or Det. Stump was harmless error. This assignment of error lacks merit.

*Errors Patent*

In conducting our review for errors patent in accordance with La. C. Cr. P. art. 920, we note the trial court failed to provide defendant with written notice of the sex offender notification and registration requirements, as mandated by La. R.S. 15:543. Walker's convictions of two counts of first-degree rape, as defined by La. R.S. 15:541, require he be subjected to the sex offender notification and registration requirements. La. R.S. 15:542.

20

Pursuant to R.S. 15:543, the trial court is required, using the form contained in La. R.S. 15:543.1, to notify a defendant convicted of a sex offense in writing of the registration and notification requirements. The statute further requires that an entry be made in the court minutes stating the written notification was provided.

Here, a review of the record and minutes reveals that the trial court verbally informed Walker of his sex-offender notification and registration requirements, but the written form does not appear in the record. As a result, remand is required with instructions to the trial court to provide the appropriate written notice to defendant of the sex offender registration requirements and to make an entry in the court minutes stating such notice was provided. La. R.S. 15:543; *State v. Vinson*, 54,580 (La. App. 2 Cir. 6/29/22) 342 So. 3d 469, *writ denied*, 22-01188 (La. 10/4/22), 347 So. 3d 888.

## CONCLUSION

Defendant's convictions and sentences are affirmed. This matter is remanded to the trial court with instructions to provide defendant with written notice of the requirement that he register as a sex offender and make an entry in the court minutes stating that he was provided with such notice.

**CONVICTIONS AFFIRMED; SENTENCES AFFIRMED; REMANDED WITH INSTRUCTIONS.**